The STATE of Ohio, Appellee,

v.

MURRAY, Appellant.

[Cite as *State v. Murray,* 149 Ohio App.3d 248, 2002-Ohio-3537.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–010589.

Decided July 12, 2002.

Michael K. Allen, Hamilton County Prosecuting Attorney, and Paula E. Adams, Assistant Prosecuting Attorney, for appellee.

Faulkner & Tepe, L.L.P., and A. Norman Aubin, for appellant.

MARK P. PAINTER, Presiding Judge.

{¶ 1} A jury found defendant-appellant Dale G. Murray guilty of recklessly failing to support his minor daughter from an extramarital relationship.[1] The jury thus chose to disbelieve Murray's contention that he had been unable to provide for her.[2] Because Murray had not paid support for an extended period of time, the offense for which he was convicted was a felony,[3] and the trial court sentenced him to eleven months' incarceration.

{¶ 2} Murray now appeals, arguing that, given his diminished circumstances, the conviction was against the manifest weight of the evidence. He also protests that even if his conviction was justified, the sentence of incarceration was improperly harsh. But when the sensationalism is stripped from the facts of this appeal, we are left with a man who shirked his responsibility to his daughter, and who now must serve the sentence the trial court imposed. We affirm the conviction and the trial court's sentence.

{¶ 3} The trial testimony reads like a Greek tragedy. There are staggering sums of money made and lost. There are hubris, power and influence, international intrigue, betrayal, and an extramarital fall-spring affair. There is also a trail of unsecured investors bound to Murray by the magnitude of their investments, many of whom testified on his behalf.

{¶ 4} Murray made his first fortune in 1980. He parlayed a three-year investment in Kentucky coal reserves into a personal profit of no less than $10 million. He used that profit to purchase the assets of the distressed boat manufacturer Chris–Craft, which in five years saw its annual revenue increase from $12 million to $30 million. According to Murray, he was wealthy beyond his

---

1. See R.C. 2919.21(A)(2); *State v. Collins* (2000), 89 Ohio St.3d 524, 733 N.E.2d 1118.

2. See R.C. 2919.21(D).

3. See R.C. 2919.21(G)(1).

dreams, with such accoutrements as multiple homes and jet airplanes. And, perhaps more important to Murray, he had acquired the influence to circulate in the highest echelons of society and the wherewithal to form several new business ventures.

{¶ 5} The precise details of the collapse of Murray's empire are not entirely clear from the testimony. It apparently began with a failed real-estate venture that forced Murray to sell a controlling interest in Chris–Craft, which in turn ultimately led to Chris–Craft's bankruptcy. There was testimony that the controlling interest in the company had been acquired by an international cartel later made infamous by its connection to the "BCCI" banking scandal. According to Murray, he worked with Congress, the FBI, and the CIA to convict some of the individuals responsible for the cartel's collapse. In the aftermath, Murray was left with little to show for his former success but multiple personal judgments against him, which cumulatively amounted to over $1 million.

{¶ 6} Murray decided to return to the coal business and to attempt to rebuild his fortune. Despite the reversals he had suffered, Murray was able to convince 34 investors to contribute substantial sums, in at least one case a retiree's entire life savings from the sale of a cable company, to form five separate coal companies. Murray was the president of the companies and drew a significant management fee, but the stock not owned by the investors was issued to Murray's wife because of the outstanding judgments against him.

{¶ 7} It was about this time that Murray met a young woman who worked as a topless cocktail server in Lexington, Kentucky. They began a relationship, and the woman bore Murray's daughter. Initially, he was successful in keeping these developments from his wife and quietly supported the woman and his daughter. But things eventually went from bad to worse for Murray.

{¶ 8} From a business perspective, the five coal companies were not doing well. According to the testimony, all of the initial capital Murray had raised had been spent to secure the leases and the necessary government permits to mine coal. But the market price for coal was such that the cost of mining was more than the coal was worth above ground. It seems that the companies had spent all of their capital on leases that could not be developed and were thus languishing into receivership. Meanwhile, the government permits that had been secured were soon to expire. Also, there was testimony that as the investors began to scrutinize the companies' expenditures more closely, certain company payments were discovered to have been made to a young woman in Lexington. This resulted in a shareholder lawsuit.

{¶ 9} If matters could still get worse, they did. The young woman was not coping well. Ultimately, she was diagnosed as a manic-depressive with an eating

disorder and substance-abuse problems. She was unable to care for her daughter or herself and was institutionalized.

{¶ 10} Since Murray's wife remained ignorant of the dependent child, Murray sought to place his daughter with her maternal relatives. He paid $1,000 to his daughter's great aunt and uncle to use as a retainer in securing an attorney for them to gain custody. Once they gained custody, they received little else from Murray. Over the next several years, and despite a court order that Murray pay support of $8,454 per month, he sent only the following: (1) an additional $1,000 for legal fees, (2) $500 for the cost of a DNA test, (3) a personal IOU for $15,000, and (4) 20,000 shares of apparently worthless stock in one of the coal companies. Clearly this was inadequate. But Murray argued at trial that he did the best that he could have done under the circumstances.

{¶ 11} The testimony of the witnesses was consistent that the new coal companies had never generated operating income, and that all of the equity investments had been expended. It is also true that the people to whom Murray was indebted were legion. They included the 34 investors in his coal companies, the IRS, his attorney, his accountant, those who had previously obtained judgments against him, the owner of the house in which he and his wife lived, and even the private school from which an elder daughter had graduated.

{¶ 12} Yet Murray managed to live by selling assets such as furniture and jewelry, and by borrowing from friends and relatives. None of this money was ever shared with his daughter. Despite his dire economic circumstances, Murray could have provided *something* for the support of his daughter. In the absence of any good-faith support payments acknowledging his responsibility, the jury did not lose its way in concluding that Murray had recklessly failed to support his daughter. We overrule Murray's first assignment of error.

{¶ 13} Next Murray argues that his 11–month jail sentence was too harsh. We have compared the trial court's findings with the record and the applicable sentencing statutes,[4] and there is no discernible error. We thus overrule Murray's second assignment of error and affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT and WINKLER, JJ., concur.

---

4. See R.C. 2929.13 and 2929.12.